IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JEROME GIBSON                  :               CIVIL ACTION
                                      :
        v.                         :
                                        :
JEFFREY BEARD, et al.             :               NO. 10-445

MEMORANDUM

Dalzell, J.                                                           February 29, 2016

## I.    **Introduction**

We consider here petitioner's objections to the Report and Recommendation ("R & R") issued by the Honorable Carol Sandra Moore Wells.

Jerome Gibson filed this counseled petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 against Jeffrey Beard, the former Secretary of the Pennsylvania Department of Corrections, and Louis Folino, the Superintendent of the State Correctional Institution at Greene. Judge Wells found Gibson's claims to lack merit.  Gibson now objects to the R & R, stating that Judge Wells erred when analyzing his Brady claims, ineffective assistance of counsel claims, challenge to the reasonable doubt instructions, prosecutorial misconduct claims relating to the testimony of Michael Segal, claims related to testimony regarding Gibson's hypothetical question to police, and cumulative error claim.

Gibson also objects to Judge Wells's denial of his final motion for discovery and requests an evidentiary hearing to develop facts in support of his claims.  Finally, he asks in the alternative that we grant a certificate of appealability even if we approve and adopt the R & R.

For the reasons set forth below, we will overrule Gibson's objections to the R & R, deny his request for an evidentiary hearing, and decline to issue a certificate of appealability.

**II.    Standard of Review**

Gibson objects to the R & R pursuant to Local R. Civ. P. 72.1 IV(b), which provides that

"[a]ny party may object to a magistrate judge's proposed findings, recommendations or report

under 28 U.S.C. 636(b)(1)(B) … within fourteen (14) days after being served with a copy

thereof" by filing "written objections which shall specifically identify the portions of the

proposed findings, recommendations or report to which objection is made and the basis for such

objections."  We make de novo determinations on those portions of the R & R and specific

proposed findings or recommendations to which the petitioner objects.  See 28 U.S.C. § 636.

**III.    Factual and Procedural History**

We recite the facts and procedural history as evidenced by the record and Judge Wells's

R & R.[1]

> On the morning of September 29, 1994, Gibson sought to obtain an
> automobile, as his car had recently broken down. He asked a
> friend, Sean Hess, for $200 so that he could purchase a new
> vehicle. When Hess refused, Gibson spoke of "making a move,"
> meaning that he would commit a robbery.
>
> At approximately noon on that same day, Gibson went to an
> automobile dealership in Bristol Township to look for a
> replacement vehicle. Although he expressed an interest in
> purchasing a vehicle that was shown to him by salesman Glen
> Kashdan, he did not have the necessary funds. He told Kashdan,
> however, that his mother maintained sufficient funds in a bank
> account in Bristol Borough to pay for the vehicle. After Kashdan
> drove Gibson to the bank in a fruitless effort to withdraw the non-
> existent funds, he dropped Gibson off at a shopping center in
> Bristol Township, about one mile from the eventual scene of the
> crime. Gibson was wearing a dark hooded sweatshirt and jeans.
> Melissa Paolini, who worked at the bank where Kashdan had taken
> Gibson, observed the two men enter the bank at approximately

---

[1] We may properly reference Judge Wells's factual and procedural history because
Gibson did not object to this portion of the R & R.  Moreover, our thorough review of the record
confirms that Judge Wells's recitation of the factual and procedural history in this case is
accurate.

1:15 p.m. Gibson's picture was taken by the bank's monitor camera and was later identified by Paolini at trial. The picture clearly depicted Gibson wearing a dark hooded sweatshirt.

Shortly before 2:00 p.m., Gibson met Paulinda Moore, a long-time acquaintance, in the shopping center. Gibson showed Moore a handgun that was tucked into the waistband of his pants and stated that he needed money and was going to rob somebody. He added that if his prospective victim saw his face, he would shoot him. Gibson and Moore then parted company and Gibson continued on foot to Bristol Borough.

Kevin Jones, another acquaintance, encountered Gibson a little while later. Gibson informed Jones that he knew "a guy that had money," whom he was going to rob, killing him if necessary. At approximately 2:00 p.m., Vera DuBois, Gibson's aunt, saw Gibson on foot in Bristol Borough and noticed that he was wearing a dark hooded sweatshirt. At 2:20 p.m., Gibson entered a jewelry store. Leonard Wilson, the store's proprietor, became suspicious of Gibson when he noticed that Gibson appeared to be observing the store itself, rather than looking at jewelry. After a brief conversation with Wilson, Gibson left the store.

Between 2:30 and 3:00 p.m., Kimberly Rankins, another acquaintance, nearly hit Gibson with her car as he was crossing Mill Street in the direction of the Ascher Health Care Center ("Ascher Health") in Bristol Borough. The last time that Rankins observed Gibson that day, he was wearing a dark blue sweatshirt and was approximately twenty-five feet away from the entrance of Ascher Health, walking towards it.

Shortly before 3:00 p.m., Michael Segal, a shopkeeper at a store directly across the street from Ascher Health, heard a gunshot from inside Ascher Health. Segal looked across the street and saw Robert Berger, the proprietor of Ascher Health, struggling with an assailant behind the store counter. When Segal observed that the assailant had a gun, he dialed "911." While on the telephone, he heard two more gunshots. He looked across the street and saw Berger lying on the floor while the assailant rifled through the cash register drawers. Segal then observed the assailant leave the store, stuffing items into his pants, and walk up Mill Street towards an apartment building. Segal was unable to see the assailant's face, but he did observe that the man was wearing a dark blue hooded sweatshirt. Segal later testified at trial that the man's size, build and complexion matched those of Gibson.

Alfonso Colon, who was in a second floor apartment above Ascher Health that afternoon, walked downstairs and went outside after hearing the three gunshots. He saw Gibson, whom he positively identified at trial, leaving Ascher Health and walking toward him while stuffing an object that appeared to be a handgun into his pants. Upon seeing Colon, Gibson crossed Mill Street and headed in a different direction.

At 2:58 p.m., the police responded to Segal's call. They entered Ascher Health and found Berger lying dead on the floor from gunshot wounds. A cash drawer was open and there was an empty gun holster on the floor. Berger was pronounced dead upon arrival at the hospital at approximately 3:45 p.m. An autopsy revealed that he had suffered three gunshot wounds: a fatal wound to the left chest, a wound to the upper right chest, and a wound to the upper left arm. Two .32 caliber projectiles were removed from the body. It was later determined that approximately $1,400 in cash had been stolen during the robbery, along with a .38 caliber handgun belonging to Berger. There was no evidence that Berger's gun had been fired during the robbery.

Shortly after 3:00 p.m. on the day of the shooting, Gibson arrived at the home of his cousin, Pamela Harrison. When Harrison responded to Gibson's knock on her door, she observed that he was wearing a dark hooded sweatshirt and was sweating. Harrison also heard police sirens. Gibson asked to come into the house and Harrison admitted him, noticing that he was carrying a handgun. After hiding his sweatshirt in Harrison's basement, Gibson left the house. He returned later that evening and retrieved the sweatshirt without Harrison's permission.

After leaving Harrison's house, Gibson met his friend, Sean Hess, in the shopping center where Gibson had been earlier that day. Gibson told Hess that he had shot a man three times and taken his money. Gibson also stated that the victim had a gun, but that he had used his own gun.

The following day, while at a bar, Gibson admitted to Bernard McClean that he had shot the old man in Bristol three times, explaining that he had been broke and needed the man's money. He later told his friends, Herman Carroll and Eddie Jones, that he had robbed and killed the victim. He also told Edward Gilbert, another friend, that he had killed the victim to obtain money with which to purchase a vehicle. He gave Gilbert the .32 caliber handgun, along with Berger's .38 caliber handgun, to keep for him. Berger's gun

4

was later recovered at a motel in Bristol Township, but Gibson's gun was never located.

On October 2, 1994, three days after the murder, two detectives from the Bucks County District Attorney's Office, who had received information implicating Gibson in the murder, went to the apartment where Gibson was staying and waited outside in their car. Shortly thereafter, Gibson and some other individuals came out of the apartment. Gibson approached the detectives and asked them if they wished to speak with him. In response to Gibson's inquiry, the detectives told him that they wished to talk to him about a murder that had occurred on Mill Street on September 29, 1994. Gibson asked if he was under arrest and the officers replied that he was not. They suggested, however, that Gibson speak with them at the Bristol Borough Police Station, since there were other people nearby. The detectives made it clear that Gibson could proceed to the station by his own transportation, that he would be free to leave the station at any time, and that he could terminate the conversation whenever he wished. Gibson acquiesced and followed them to the police station in his own vehicle, which he had purchased the day after the shooting.

Upon arriving at the police station, the detectives led Gibson to an interview room, where another detective and a Bristol Borough police officer joined them. Gibson was again advised that he was not under arrest and could leave the station at any time. When the detectives told Gibson that they wanted to discuss the robbery and murder of Berger, he indicated that he wanted to clear the matter up and would speak with them. The interview lasted for a little over two hours, during which Gibson not only denied any culpability for the shooting, but also denied having been in Bristol Borough at any time after August 2, 1994. Following the interview, Gibson agreed to a search of his vehicle and signed a consent form. During the search, Gibson initiated a conversation with one of the detectives, asking him a hypothetical question regarding what would happen if someone were attacked by a man with a gun and shot and killed his attacker. Gibson then left the police station in his vehicle.

On October 6, 1994, Gibson was arrested and charged with the robbery and murder of Berger, as well as possession of instruments of crime. Bail was denied, and while Gibson was incarcerated pending trial, he admitted to inmates Glenn Pollard, Kenneth Johnson and Kevin Jones that he had committed the crimes. Prior to trial, Gibson moved to suppress his statements to the police during the October 2, 1994 interview, as well as the statement that

5

he made to the detective during the search of his car. The motion was denied following a hearing, and the case proceeded to trial. During the guilt phase of trial, the Commonwealth presented the testimony of the numerous witnesses who had seen or spoken with Gibson either immediately before or after the shooting, including the testimony of those witnesses to whom Gibson had inculpated himself. Additionally, several detectives and police officers testified for the Commonwealth concerning their observations of the crime scene, the collection of evidence, and the statements that Gibson made during the course of his interview, as well as his hypothetical question concerning the shooting.

Gibson presented five witnesses whose testimony supported his alibi defense and contradicted the testimony of certain inmates who had testified concerning his inculpatory statements. Gibson also took the stand and testified that he was not on Mill Street on the afternoon of the murder, but did admit that he had been with Kashdan, the car salesman, at the bank in Bristol Borough earlier that day. Gibson further admitted that he had lied to the police concerning his whereabouts on the day of the murder.

At the conclusion of the guilt phase, the jury found Gibson guilty of first-degree murder, robbery and possession of instruments of crime.

Commonwealth v. Gibson, 720 A.2d 473, 476-79 (Pa. 1998).

At the penalty phase, the jury determined that Gibson should be sentenced to death.  Id. at 478.   The Pennsylvania Supreme Court affirmed the verdict and sentence after Gibson appealed. Id. at 485.  The Supreme Court of the United States denied certiorari in 1999.  Gibson v. Pennsylvania, 528 U.S. 852 (1999).

Gibson then sought relief under the Post Conviction Relief Act ("PCRA") 42 Pa.C.S.A. § 9541, et seq.  The PCRA court denied guilt-phase relief but awarded a new sentencing hearing. Commonwealth v. Gibson, 925 A.2d 167, 169 (Pa. 2007).  The Pennsylvania Supreme Court affirmed this conclusion and transferred Gibson's appeal to the Superior Court for appellate review of the trial court's guilt-phase rulings.  Id. at 171.  The Pennsylvania Superior Court found Gibson's claims to be either waived or without merit.  Commonwealth v. Gibson, Nos.

1778 & 1779 EDA 2007, slip op. at 1-35 (Pa. Super. Ct. July 8, 2008).  The Pennsylvania

Supreme Court denied allowance of appeal in February of 2009.

Gibson filed the petition before us on January 29, 2010.  Judge Wells issued her R & R

on July 28, 2015, and Gibson timely filed his objections on October 27, 2015.  We consider

those objections here.

IV.     **Discussion**

Gibson objects to Judge Wells's findings on his Brady claims, ineffective assistance of

counsel claims, challenge to the reasonable doubt instructions, prosecutorial misconduct claims

relating to the testimony of Michael Segal, claims related to testimony regarding Petitioner's

hypothetical question to police, and cumulative error claim.  We will analyze each objection

separately and pursuant to the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").

A.      **AEDPA Standard**

The standards from AEDPA govern our de novo review.  AEDPA permits one in state

custody to file a petition in federal court seeking a writ of habeas corpus, 28 U.S.C. § 2254(a),

but mandates great deference to the state court's factual findings and legal determinations. See

Woodford v. Viscotti, 537 U.S. 19, 24 (2002) (explaining Section 2254(d)'s highly deferential

standard for evaluating state court rulings); see also Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir.

2000) (explaining that AEDPA increased the deference federal courts must give to the state

court's factual findings and legal determinations).  In fact, AEDPA only permits a federal court

to grant habeas relief when it finds that a state court decision was "contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme

Court," or that the state court decision was "based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Moreover, we must presume that the findings of fact made by the state court are correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1).

A state court's finding is "contrary to" Supreme Court precedent if the state court "arrives at a conclusion opposite to that reached by this Court on a question of law," or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours."  Williams v. Taylor, 529 U.S. 362, 405 (2000).  A state court decision can be considered an "unreasonable application" in two circumstances.  First, a state court decision is unreasonable when a court "identifies the correct governing legal rule…but unreasonably applies it to the facts" of a particular case.  Id. at 407.  Second, a decision can be considered unreasonable when a state court extends a legal principle espoused by the Supreme Court to a new context or, conversely, refuses to extend that principle to a new context where it should indeed apply.  Id.

A state court decision is considered an unreasonable determination of the facts only when the factual findings are "objectively unreasonable in light of the evidence presented in the state-court proceeding."  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Moreover, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary."  Id.  But, "deference does not imply abandonment or abdication of judicial review [or]…by definition preclude relief."  Id.

A petitioner must exhaust his state court remedies before obtaining habeas relief.  28 U.S.C. § 2254(b)(1)(A).  In Pennsylvania, an inmate exhausts his state court remedies by fairly presenting his claims to the state court and then the Pennsylvania Superior Court, and he need not seek allocatur from the Pennsylvania Supreme Court.  Lambert v. Blackwell, 387 F.3d 210,

233-34 (3d Cir. 2004) (examining the effect of the Pennsylvania Supreme Court's May 9, 2009 Order regarding appeals from criminal convictions and post-conviction relief matters).

If a petitioner fairly presented his claim to the state court, but the state court declined to review the claim on the merits because of a failure to comply with a state procedural rule, then the claim is procedurally defaulted.  Harris v. Reed, 489 U.S. 255, 262-63 (1989).  If a lower state court has declined to review a claim based on a procedural default, and the claim is not later addressed on the merits by a higher state court, then a federal habeas court must presume that the higher state court's decision was founded upon a procedural default identified by the lower state court. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) (explaining also that if a lower state court comes to a reasoned judgment rejecting a federal claim and a higher court upholds that judgment without explanation, then the habeas court must assume that the higher court rested upon the same grounds as the lower state court).  If a petitioner fails to exhaust a claim and it is clear that the state court did not consider the claim because of a state procedural rule, then the claim is procedurally defaulted.  Coleman v. Thompson, 501 U.S. 722, 735 (1991).  For example, a state court might not review a claim that had not been previously presented because of a state rule establishing a statute of limitations for state collateral review of a conviction.  See, e.g., Keller v. Larkin, 251 F.3d 408, 415 (3d Cir. 2001) (citing 42 Pa. C.S. § 9545(b)(1), Pennsylvania's statute of limitations for filing PCRA petitions).

We also may not review procedurally defaulted claims unless the petitioner can demonstrate a requisite cause for the default and that actual prejudice exists as a result of the alleged violation of federal law, or that failure to consider the claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 750.  To demonstrate the requisite cause for a petitioner's default, he must show that some objective factor external to the defense impeded his

efforts to comply with the state's procedural rules.  Id. at 753.  Such cause may include showing that (1) the factual or legal basis for a claim was not reasonably available, (2) some interference by state officials made compliance with the state procedural rules impracticable, or (3) there was ineffective assistance of counsel from attorney error.  Id.

### B.    *Brady* Claims

Gibson first objects to the R & R's disposition of his Brady claims.  The Supreme Court held in Brady v. Maryland that a prosecutor's suppression of material evidence that was favorable to the accused violated due process.  373 U.S. 83, 87 (1963).  It later clarified that the Brady rule applied to both exculpatory evidence and evidence that could be used to impeach witnesses.  See United States v. Bagley, 473 U.S. 667, 676 (1985).  The failure to disclose favorable evidence alone is not sufficient to establish a constitutional violation.  See Johnson v. Folino, 705 F.3d 117, 128 (3d Cir. 2013).  A habeas petitioner is only entitled to relief when: "(1) the evidence at issue is favorable to the accused; (2) the evidence was suppressed by the state; and (3) the evidence is material."  Id.

Prosecutors have an affirmative duty to disclose evidence favorable to the accused, even if the accused makes no disclosure request.  See Strickler v. Greene, 527 U.S. 263, 280 (1999).  This duty extends to "any favorable evidence known to the others acting on the government's behalf…including the police."  Kyles v. Whitley, 514 U.S. 419, 437 (1995).  Those working on the government's behalf include the police officers and police departments working on the specific case in question, but do not include "other government agencies that have no involvement in the investigation or prosecution at issue."  United States v. Merlino, 349 F.3d 144, 154 (3d Cir. 2003) (quoting United States v. Morris, 80 F.3d 1151, 1169 (7th Cir. 1996)).

Evidence is material under <u>Brady</u> when there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>Simmons v. Beard</u>, 590 F.3d 223, 234 (3d Cir. 2009) (quoting <u>Bagley</u>, 473 U.S. at 682). <u>Brady</u> materiality is relative, as it "depends almost entirely on the value of the evidence relative to the other evidence mustered by the state." <u>Johnson</u>, 705 F.3d at 129 (quoting <u>Rocha v. Thaler</u>, 619 F.3d 387, 396 (5th Cir. 2010)). As our Court of Appeals has noted, "[s]uppressed evidence that would be cumulative of other evidence or would be used to impeach testimony of a witness whose account is strongly corroborated is generally not considered material…however, undisclosed evidence that would seriously undermine the testimony of a key witness may be considered material." <u>Id.</u> (internal citations omitted). In a case, such as this one, where there are potentially multiple <u>Brady</u> violations, the effect of those violations must be "considered collectively, not item by item." <u>Kyles</u>, 514 U.S. at 436. We must therefore review each <u>Brady</u> claim brought by the petitioner, identify which claims are actual examples of the prosecution suppressing favorable evidence, and then analyze the cumulative effect of those identified violations on the trial. <u>See Simmons</u>, 590 F.3d at 234 (stating that a court must "first review each individual <u>Brady</u> claim, and then discuss their collective effect on [the petitioner's] trial").

### 1.    <u>Edward Jones</u>

Gibson first brings a <u>Brady</u> claim with regard to Edward Jones, claiming that the Commonwealth failed to disclose that Jones was an informant who was provided cash, auto repairs, and an apartment by the Drug Enforcement Administration ("DEA") and the Bristol Township Police Department.

At Gibson's trial, Jones testified that Gibson had spoken to him about committing robberies and recruited him to commit further robberies.  Notes of Testimony ("N.T."), March 9, 1995 at 346-348.  Jones further stated that Gibson told him that he was going to rob a store in Bristol Borough, and then later told Jones that he had killed a storekeeper in Bristol Borough.  Id. Finally, Jones testified that Gibson called the victim a "white devil," or "cracker."  Id.

During the course of the post-conviction proceedings it was revealed that Jones had been a paid informant for the DEA after being recruited by Detective R.J. Miles of the Bristol Township Police.  See N.T. April 7, 2001 at 264-265.  Specifically, Jones received nearly $10,000 in payments from the DEA, including $1,500 the day after he gave his statement against Gibson.  See PCRA1 Ex. D-69 (Jones Decl.) and PCRAR1 Ex. D-66B.  Jones was also provided with an apartment and payment for auto repairs.  N.T. May 29, 2001 at 38-61.

Moreover, Jones retracted his trial testimony before the PCRA court, and testified in 2001 that Detective Mills had provided him with the story he gave during his initial interview with the prosecution team working on Gibson's case.  Id. at 268.  Notably, Detective Mills and two DEA agents were in the room when Jones gave his initial statement incriminating Gibson to Detective Robert Gergal, the lead Bucks County detective on the case.

We find that the evidence proffered by Gibson satisfies the first two prongs of Brady with respect to the payments and favors provided to Jones.  The defense team could easily have used evidence that Jones was a paid informant to impeach his credibility, and thus this evidence was favorable to Gibson.  Further, we disagree with Judge Wells's finding that the prosecution did not suppress this evidence because the DEA and Bristol Township Police were not part of the prosecution team.  Agents from both entities were not only in the room while Jones gave his initial statement, but they brought him to the meeting with Gergal.  The Commonwealth's

12

argument that the DEA and Bristol Township Police were not part of the prosecution team because Gergal never asked Detective Mills or the DEA agents whether Jones was a paid informant is unpersuasive.  If we accept the idea that the lead detective  on a case can simply turn his head when a potential witness comes in accompanied by other law enforcement personnel, we would set a terrible precedent that would incentivize active ignorance on the part of investigative and prosecution teams.  Gergal cannot in good faith claim that he had no idea or was not in the least curious as to whether Jones was a paid informant.  Moreover, Mills admitted that he worked on the case, as he "prepared a report and referred it to the people who had jurisdiction."  N.T. May 29, 2001, at 47.

We find that the evidence surrounding Jones's status as a paid informant was "known… to others acting on the government's behalf."  Kyles, 514 U.S. at 437.  We find it impossible that a Detective who wrote reports for the prosecution team and personally accompanied a witness to give his statement in a homicide case can be considered to be working for another government agency that has "no involvement in the investigation or prosecution at issue."  Merlino, 349 F.3d at 154.  We will consider this claim when we cumulatively analyze the violations for materiality.

### 2.  Glenn Pollard

Gibson next brings a Brady claim on evidence as to Glenn Pollard.  Pollard testified at trial that Gibson had confessed to the murder of Berger when he overheard him talking to another person.  N.T. March 10, 1997 at 398.  But the prosecution did not disclose that Pollard frequently testified on behalf of the Commonwealth or that Pollard wrote to the Bucks County District Attorney's Office offering to testify in a separate case.  N.T. May 29, 2001 at 89. Pollard also wrote a letter to Bucks County Detective John Mullin requesting assistance in his criminal matter from Mullin and the prosecutor, something that Gibson claims could have been used to

impeach Pollard on cross-examination.  Id.   Finally, Pollard provided a statement concerning

drug dealings in a separate matter to the Bristol Township Police Department in 1991.  Id.

Judge Wells found that the letter to the Bucks County District Attorney and the letter to

Detective Mullin satisfied the first two prongs of Brady, and thus considered them in her

materiality analysis.  But, she found that Pollard's statement to the Bristol Township Police in

1991 did not satisfy the first two prongs of Brady since the Bristol Township Police were not on

the prosecution team in Gibson's case.  Gibson objects to this finding and we overrule his

objection.  While we have found that Detective Mills of the Bristol Township Police was part of

the investigation team, and thus the prosecution had the duty to disclose information known to

the Bristol Township Police, providing a statement in a different case does not by itself create

impeachment evidence favorable to Gibson.  We will consider only Pollard's letters to Detective

Mullin and the Bucks County District Attorney in our materiality analysis.

### 3.      Cyril Thomas

Gibson also brings Brady claims regarding evidence allegedly suppressed relating to

Cyril Thomas, who testified at trial that he had received a gun from Eddie Gilbert, who in turn

testified that he received said gun from Gibson.  N.T. March 9, 1995, 303.  Gibson avers that the

prosecution suppressed evidence that Thomas possessed crack cocaine and a weapon when he

was arrested in 1994, and that he was threatened with prosecution in order to secure his trial

testimony.  Obj. at 23.  Judge Wells found that the claim relating to Thomas having crack

cocaine and a weapon in his possession was time barred, and that there was no evidence that

Thomas was actually threatened with prosecution to secure his testimony.  Gibson objects and

we will overrule his objection.

Gibson had actual possession of these documents since 2001 and yet never raised a claim regarding them in the PCRA Court or his original habeas petition.  N.T. April 27, 2001 at 27-28, N.T. May 29, 2001 at 33.  Gibson maintains that his challenge is timely, as it relates back to the averments in the Petition that the Commonwealth was using charges against Thomas in order to gain his cooperation.  But, this claim is, in fact, different from the ones in Gibson's original Petition, and thus the claim is untimely under AEDPA's one-year statute of limitations.  See 28 U.S.C. § 2244(d)(1)(D).

We agree with Judge Wells's finding that there is no evidence that the prosecution offered Thomas a deal concerning his pending charges in exchange for his testimony against Gibson.  The only evidence Gibson points to is a notation in Thomas's Juvenile Probation file that Detective Mullin said he was going to threaten Thomas with prosecution if he did not cooperate, something Detective Mullin denied.  See Petition ¶¶ 42-45 and N.T. May 29, 2001 at 83-88.  This does not suffice to show that this evidence exists, let alone that it was suppressed. The Brady claims Gibson brought in relation to Cyril Thomas will not factor in our materiality analysis.

### 4.    Paulinda Moore

Gibson next claims that the prosecution withheld evidence of Paulinda Moore's mental health.  Moore testified at trial that Gibson had told her he was going to Bristol Borough to rob someone and that he showed her a gun.  N.T. March 9, 1995 at 253-54.  Judge Wells found that evidence of Moore's mental health issues, most notably an Order for Moore to undergo a mental health evaluation, see Order for Mental Evaluation, November 11, 1994, did not constitute Brady material because the prosecution team was not aware of her medical records or the court order (for that matter).  Gibson objects to this finding.  But the prosecution should have known of the

Order for Moore to undergo a mental health evaluation because it had prosecuted her in the criminal matter.  This evidence further could have been used to impeach Moore on cross examination, and therefore it satisfies the first two prongs of <u>Brady</u>.  We will consider this order in our materiality analysis.

### 5.   <u>Kevin Jones</u>

Gibson next asserts a <u>Brady</u> claim based upon the testimony of Kevin Jones, who at trial testified that Gibson had said he was going to rob "an old guy" with a "lot of money" in Bristol Borough, and then later confessed to the killing while the two were in jail together.  N.T. March 9, 1995 at 267-72.  Gibson avers that the prosecution withheld evidence favorable to his case when it failed to disclose a report showing that Kevin's twin brother, Eric Jones, had spoken with police looking for help in two robbery cases in return for information on the Berger homicide, Mot. to Expand, Ex. B, and that Kevin was allowed to avoid prison even though he was not reporting to his parole agent.  PCRA1 Ex. D-60.  Judge Wells found that this evidence was not favorable to Gibson, as it is not indicative of Jones striking a deal with the prosecution in order to secure his testimony at trial, and Gibson objects to this finding.  We agree with Judge Wells that a conversation with Jones's brother, Eric, and evidence that Jones was not reporting to his parole officer would not have been useful to the defense in its cross-examination of Jones.  We therefore overrule Gibson's objection, and the <u>Brady</u> claims brought by Gibson in relation to Kevin Jones will not be considered in our materiality analysis.

### 6.   <u>Eddie Gilbert</u>

Gibson further adds a <u>Brady</u> claim on evidence relating to Eddie Gilbert's testimony.  Gilbert testified at trial that Gibson had given him two handguns after the Berger shooting -- one

of which was Berger's .38 caliber handgun.  N.T. March 9, 1995 at 291.  Gibson asserts that the

prosecution withheld evidence that Gilbert participated in a September 15, 1994 drug sale and

September 23, 1994 drug sale, Pet. App'x Vol. III at 628-30, withheld documentary evidence

showing that Gilbert failed to appear as requested for an interview during an investigation into a

separate homicide, Mot. to Expand, Ex. B; PCRA2 Ex. D19, and withheld evidence that Gilbert

had lied to police when he denied dealing drugs in 1995.  PCRA2 Ex. D20.  Gibson objects to

Judge Wells's findings that none of the evidence related to Gilbert was Brady material.  We will

sustain the objection relating to the evidence that Gilbert participated in drug sales only in the

sense that we will consider it as part of our materiality analysis. But we will overrule Gibson's

objection in regards to the evidence of Gilbert allegedly lying to police about drug sales and

refusing to cooperate in a separate murder trial.

 We have found that Judge Wells erred when she held that the Bristol Township Police

were not involved in the prosecution of Gibson.  Therefore, the prosecution should have known

about Gilbert's participation in drug sales in 1994.  This would have been helpful to Gibson

when cross-examining Gilbert, even if Gibson was present at one of the drug sales.  We therefore

find that this evidence satisfies the first two prongs of Brady, and we will consider it in our

materiality analysis.

 The same cannot be said for the evidence Gilbert allegedly lied to police about dealing

drugs or failing to appear for an interview during an investigation into a separate homicide.  The

latter item of evidence is not helpful in any way to Gibson's case, as simply failing to appear for

an interview with police does not impact Gilbert's credibility.   The document containing

Gilbert's statement where he allegedly lied about past drug sales did not exist at the time of trial,

so the prosecution could not have suppressed it.  This evidence thus will not weigh in our

materiality analysis.

### 7.     <u>Sean Hess</u>

Gibson also avers that evidence related to Sean Hess's testimony constitutes <u>Brady</u>

material.  Hess testified at trial that Gibson told him that he was going to rob a store, and Gibson

later told Hess that he had completed the act.  N.T. March 8, 1995 at 209-214.  Gibson maintains

that the prosecution withheld evidence that Hess was pressured by the police to testify against

Gibson, and prior to trial police had kicked in the door of Hess's mother's home and caused

damage to the house, something that Detective Gergal was aware of.  N.T. May 29, 2001 at 164.

Hess testified at a hearing in front of the PCRA court that he had fabricated his testimony after

the police threatened him in many ways.  <u>See</u>, <u>e.g.</u>, N.T. April 27, 2001 at 130-136.  The PCRA

court did not believe Hess's testimony.  2002 PCRA Ct. Op. at 15.

We agree with Judge Wells's conclusion that Gibson has failed to rebut the PCRA court's

finding that Hess's PCRA testimony was untruthful -- as AEDPA requires.  <u>See</u> 28 U.S.C. §

2254(e) (1).  But, we find that the prosecution did withhold evidence of coercion when it failed

to disclose that police had broken into the home of Hess's mother, causing extensive damage,

since Detective Gergal of the prosecution team was aware of this incident.  Further, a jury could

have interpreted this act as intimidation, and thus the evidence would have been useful to

Gibson's case.  We therefore find that the evidence of damage to Hess's mother's home meets

the first two prongs of <u>Brady</u>, and we will consider them in our materiality analysis.

####        8.      Corey Jones

Gibson additionally adds a Brady claim regarding Corey Jones.  Jones did not testify at

Gibson's trial, but he testified at Gibson's 2001 PCRA hearing that he had been harassed and

pressured by police to make a statement against Gibson in the Berger murder.  N.T. April 27,

2001 at 189-210.  Jones claimed that police questioned him for five hours without food or drink,

told him he was not free to leave the police station, and threatened to charge him as an accessory

to murder without his cooperation.  Id. at 193-198.  Judge Wells found that the evidence related

to Jones's interrogation was not Brady material and Gibson objects.  We will overrule Gibson's

objection.

Jones did not testify at trial, so the evidence cited by Gibson would not have been helpful

as impeachment evidence.  It also would not be exculpatory since nothing Jones testified to at the

PCRA hearing was materially related to the evidence which served as the basis for Gibson's

conviction.  Finally, the PCRA court found that Jones was not credible, 2002 PCRA Ct. Op. at

15, and Gibson has failed to rebut the statutory presumption of that finding by clear and

convincing evidence, and we will thus not consider it in our materiality analysis.

####        9.      Hermann Carroll

Gibson next claims that evidence relating to Hermann Carroll's testimony also constitutes

Brady material.  Carroll testified that Gibson had confessed to Berger's murder.  N.T. March 9,

1995 at 371.  But the prosecution did not disclose evidence that Detective Gergal had offered to

testify at Carroll's sentencing hearing if Carroll assisted with the Gibson case, N.T. May 29, 2001

at 125-26, or that Bucks County Detective John L. Ziemba told Carroll to contact the prosecutor

to come to an arrangement when Carroll approached Ziemba and said that he was hesitant to

testify against Gibson.  Mot. to Expand at Ex. B25.  Judge Wells found that both of these items

met the first two prongs of <u>Brady</u>, and we will consider this evidence as part of our materiality analysis.

### 10.   **Bernard McLean**

Lastly, Gibson asserts both <u>Brady</u> and <u>Napue</u> claims regarding Bernard McLean. McLean testified at trial that Gibson had confessed to the murder.  N.T. March 9, 1995 at 232-33.  Gibson states that the prosecution failed to correct McLean's testimony at trial relating to assistance he received regarding his outstanding warrants in exchange for McLean's testimony against Gibson.  Gibson also avers that the Commonwealth suppressed evidence that Bernard McLean had used a false name when speaking to Bristol Township Police.  <u>See</u> Mot. to Expand at Ex. B; <u>see</u> <u>also</u> PCRA2 Ex. D22.  Judge Wells found both the <u>Brady</u> and <u>Napue</u> claims without merit, and Gibson objects.

Our thorough review of the record leads us to agree with Judge Wells.  As to the <u>Napue</u> claim, McLean testified at trial that the police said they would assist him with his outstanding warrants if he provided a statement against Gibson.  N.T. March 9, 1995 at 244.[2]  Gibson has not provided evidence that McLean committed perjury, and without such proof it cannot be claimed that the prosecutor had a duty to correct McLean's statement.  The <u>Brady</u> claims similarly lack merit.  The prosecution team did have two reports, one from September 1994 and one from April 1995 in its possession.  But neither item of evidence meet the first two prongs of <u>Brady</u>.  The April 1995 report did not exist at the time of trial, so it could not have been suppressed.  As for the September 1994 report, McLean had already been cross-examined about his criminal past and cooperation with the prosecution.  The fact that he had used a false name in an interview

---

[2] The Supreme Court held in <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959) that the prosecution violated due process when it failed to correct testimony it knew to be false.  <u>See</u> <u>also</u> <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972).  We undertake a much deeper discussion of <u>Napue</u> later in our Opinion.

with Bristol Township Police for a different murder would not have helped the defense impeach him in this matter.  We will overrule Gibson's objections with regard to Bernard McLean and will not consider this evidence in our materiality analysis.

### 11.     Materiality Analysis

We must now evaluate the items of evidence that were favorable to Gibson and that the prosecution suppressed and determine whether there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," with "reasonable probability" defined as "a probability sufficient to undermine confidence in the outcome."  Simmons, 590 F.3d at 234.  The evidence we must evaluate includes:  (1) Edward Jones being a paid informant for the DEA and Bristol Township Police, see PCRA1 Ex. D-69 (Jones Decl.) and PCRAR1 Ex. D-66B; (2) Glenn Pollard's letter to Detective Mullin requesting assistance, N.T. May 29, 2001 at 89; (3) Pollard's letter to the Bucks County District Attorney's Office requesting the same, id.; (4) the court order for Moore to undergo a mental health evaluation, see Order for Mental Evaluation, November 11, 1994; (5) Eddie Gilbert's involvement in a September, 1994 drug sale, see Pet. App'x Vol. III at 628-30; (6) police damaging the home of Sean Hess's mother while searching for him, see N.T. May 29, 2001 at 164; (7) Hermann Carroll's discussions with Detective Gergal who offered to testify at Carroll's sentencing, see N.T. May 29, 2001 at 125-26; and (8) Carroll's letter to Detective Ziemba requesting assistance, see Mot. to Expand Ex. B25.  We conclude that these eight items of evidence, considered cumulatively, are not material since there is no reasonable probability that the result of Gibson's trial would have been different if this evidence had been turned over to his defense team.

21

First, even if the suppressed evidence would have completely discredited each of the witnesses above, there were corroborating witnesses for all but one item of the testimony now in question. Edward Jones testified that Gibson told him that he was going to rob a store and then later admitted to the crime. Kevin Jones, whose testimony is not affected by the <u>Brady</u> claims, testified Gibson told him the same thing. Glenn Pollard's testimony that Gibson confessed to the murder while in jail was similarly corroborated by the testimony of Kevin Jones and Kenneth Johnson. Likewise, Paulinda Moore's testimony was largely congruent with Kevin Jones's, who testified that he encountered Gibson a short time after Gibson spoke with Moore and that Gibson informed him that he was going to rob and possibly kill a man. Hermann Carroll testified that Gibson had confessed to the killing, something echoed by Bernard McLean. Sean Hess testified to both Gibson's motive and eventual confession to the crime. The confession, as we've stated, was corroborated by Kevin Jones, Kenneth Johnson, and Bernard McLean, among others. And, while Gibson did not ask anyone else for money to buy a car, as he did with Hess, that day he visited an automobile dealership and tried to purchase a car, as evidenced by Glen Kashdan's testimony.

Second, the only testimony affected by <u>Brady</u> material and not corroborated by other evidence is Eddie Gilbert's testimony about receiving the guns from Gibson. But the only impeachment evidence the prosecution suppressed relating to Gilbert was the fact that he participated in a drug sale in 1994. Given that Gilbert testified at trial about a prior conviction for drugs, we find that the suppressed evidence would not have impacted the jury's assessment of Gilbert's credibility.

Third, and most importantly, the case against Gibson was very strong, even when completely discounting all of the testimony from witnesses who could have been impeached with

the <u>Brady</u> material.  Multiple people, including Gibson's aunt, testified to seeing Gibson that day, before the murder, wearing a dark hooded sweatshirt.  Security footage at a bank Gibson visited that day confirmed he was wearing this apparel.  Michael Segal, a shopkeeper across the street from the building where Berger was killed, saw Berger struggling with an assailant in a dark hooded sweatshirt who matched Gibson's size, build, and complexion.  Alfonso Colon, who lived above the store where Berger was shot, heard gunshots and saw Gibson leaving the scene while stuffing what appeared to be a handgun into his waistband.   Gibson's cousin, Pamela Harrison, saw Gibson later that day after he visited her home.  She said he was wearing a dark hooded sweatshirt and carrying a handgun.   Finally, Gibson confessed to the murder to Bernard McLean, Kenneth Johnson, and Kevin Jones, among others.  The evidence overwhelmingly supported the conclusion that it was Gibson who killed Berger.

The corroboration of the testimony affected by the <u>Brady</u> material, coupled with the mountain of other evidence against Gibson, makes clear that the evidence suppressed by the prosecution was not material.  We will overrule Gibson's objection to Judge Wells's finding that the suppressed evidence was not material.

## C.    <u>Ineffective Assistance of Counsel Claims</u>

Gibson next objects to the R & R's disposition of his ineffective assistance of counsel claims, but we will overrule his objections.  The Sixth Amendment guarantees every criminal defendant the assistance of counsel.  U.S. CONST. amend. VI.  This assistance must not only be perfunctory, but effective.  <u>See</u> <u>Saranchak v. Sec'y Pa. Dep't of Corr.</u>, 802 F.3d 579, 588 (3d Cir. 2015) (stating that defendants are entitled to the effective assistance of counsel).  The right to effective assistance of counsel protects the fundamental right to a fair trial afforded to criminal defendants.  <u>Id.</u> (quoting <u>Strickland v. Washington</u>, 466 U.S. 668, 685 (1984)).

The Supreme Court has laid out a two-prong test for determining whether a criminal defendant has suffered a violation of his constitutional rights by having ineffective assistance of counsel.

First, a habeas petitioner must show that his counsel's performance was deficient, meaning that the representation failed to meet an objective standard of reasonableness "as defined by prevailing professional norms."  Id. (quoting Outten v. Kearney, 464 F.3d 401, 414 (3d Cir. 2006)) (internal quotations omitted).  More specifically, "we must 'judge the reasonableness of counsel's challenged conduct on the facts of the particular case, reviewed as of the time of counsel's conduct.'"  Parrish v. Fulcomer, 150 F.3d 326, 328 (3d Cir. 1998) (quoting Strickland, 466 U.S. at 690).  But, we must be highly deferential to counsel's performance and not "second-guess counsel's assistance after conviction."  Id. (quoting Strickland, 466 U.S. at 689).

Second, a petitioner must show prejudice, meaning that he must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  This standard does not require the petitioner to prove that the evidence presented against him would have been insufficient if not for counsel's errors, nor must the petitioner show "that counsel's deficient conduct more likely than not altered the outcome."  Id. at 693.  But it does require the petitioner to go further than simply demonstrating "that the errors had some conceivable effect on the outcome of the proceeding."  Id.; see also Saranchak, 802 F.3d at 588.

### 1.    Edward Jones

Gibson first claims that his counsel was ineffective for failing to cross-examine Edward Jones on his status as a DEA informant.  Judge Wells found that Gibson had not rebutted the

PCRA court's finding that Jones's recantation of his account was untruthful and, by extension, that Jones's trial testimony must have therefore been truthful. Gibson objects to this finding. We agree with Gibson insofar as we believe Judge Wells erred when she made the aforementioned inference about the truthfulness of Jones's trial testimony and concluded that the ineffective assistance of counsel claim was without merit for that reason alone. Trial counsel still had the responsibility to cross-examine Jones to the fullest extent possible, and it appears this did not happen.

But, we do not find any prejudice for the same reasons we articulated when analyzing Gibson's <u>Brady</u> claim as to Jones. Like the materiality standard in <u>Brady</u>, a petitioner under <u>Strickland</u> must show prejudice, defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. Jones's testimony was corroborated by Kevin Jones, among others, and many other witnesses testified to Gibson's motive for committing the crime and his subsequent confessions. There is no reasonable probability that the proceeding would have been different had Jones been effectively cross-examined. While we do not find any prejudice when analyzing Gibson's claim against Jones individually, we will consider it in our cumulative error analysis.[3]

## 2. **Bernard McLean**

Gibson also asserts an ineffective assistance of counsel claim related to the testimony of Bernard McLean. Gibson maintains that trial counsel failed to adequately impeach McLean, since McLean was not questioned about his preliminary hearing testimony where he stated that

---

[3] We are well aware that ineffective assistance of counsel claims must be reviewed cumulatively. We will analyze Gibson's ineffective assistance of counsel claims cumulatively with his <u>Brady</u> claims, as it stands to reason that if these claims are not found to be prejudicial in conjunction with <u>Brady</u> errors they cannot be found to have prejudiced Gibson on their own.

the prosecutor had offered to help him with a criminal matter in exchange for his testimony.  But trial counsel <u>did</u> impeach McLean by getting him to admit that the police told him they would "take care" of his outstanding warrants.  N.T. March 9, 1995 at 244.  This fact undermines Gibson's claim under both prongs of <u>Strickland</u>.

First, trial counsel's decision not to pursue on cross-examination McLean's preliminary hearing testimony regarding the prosecutor was reasonable given McLean had already admitted that the police had offered to help him in exchange for his testimony.  Second, there is no prejudice since McLean had already been impeached on cross-examination when discussing his conversation with the police, and thus there is no reasonable probability that the outcome of the case would have been different had counsel cross-examined McLean on his preliminary hearing testimony.  While failing only one of the <u>Strickland</u> prongs would have defeated this claim, it is illustrative of this claim's weakness that it fails each prong.  We will overrule Gibson's objection.

### 3.    <u>Michael Segal</u>

Gibson next avers an ineffective assistance of counsel claim related to the testimony of Michael Segal.  Trial counsel failed to impeach Segal by having him reiterate that he could not identify Gibson's face or pick him out in a pre-trial lineup.  N.T. March 8, 1995 at 80.  Instead, Segal could only testify that Gibson had the same height, weight, build, complexion, and hair color as the assailant.  <u>Id.</u> at 79.  Judge Wells found that trial counsel's failure was not prejudicial.  Gibson objects, but we will overrule his objection.

We disagree with Gibson's assertion that it was unreasonable for trial counsel to have Segal reiterate that he could not identify Gibson in a pre-trial lineup.  First, Segal never testified that he could identify Gibson; he simply stated that the perpetrator matched many of Gibson's

characteristics.  The jury knew Segal could not identify Gibson by his face.  Second, Segal was

thoroughly cross-examined on the inconsistencies of his identifications to police.  Id. at 90-98.  It

could easily be construed as a tactical choice for counsel to have focused on the inconsistencies

of his identification to keep the jury's attention instead of highlighting the fact that Segal could

not identify Gibson by his face -- something the jury already knew.  Gibson's objection therefore

lacks merit and we will overrule it.

### 4.      Sean Hess

Gibson asserts that trial counsel was ineffective for failing to impeach Sean Hess based

on Hess's differing testimony at the trial and preliminary hearing as to whether Gibson had

referred to Berger as a "white devil" or simply a white man.  Judge Wells found that this claim

was procedurally defaulted because Gibson failed to raise the claim in his PCRA appeal, and we

agree.  It is a requirement of AEDPA that a petitioner exhaust his claim in state court before

seeking federal relief.  28 U.S.C § 2254(b)(1).  Moreover, the PCRA statute of limitations has

expired for this claim and thus it cannot be exhausted, precluding habeas review.  See Lines v.

Larkins, 208 F.3d 153, 165.  We will overrule Gibson's objection on this claim.

### 5.      Glenn Pollard

Gibson next claims that counsel was ineffective for failing to impeach Glenn Pollard with

a letter Pollard wrote to the prosecutor that was then forwarded to defense counsel.  Both the

Superior Court and Judge Wells found counsel's decision not to use the letter for cross-

examination purposes was reasonable given that the letter contained damaging information about

Gibson.  We agree and will overrule Gibson's objection.

Trial counsel testified that he decided not to use the letter to cross-examine Pollard because the letter contained information about Gibson's involvement in another shooting.  N.T. April 27, 2001 at 221.  Gibson counters that trial counsel did not even ask that the letter be redacted, and thus the assistance was ineffective, and that counsel could have cross-examined Pollard with the information in the letter without showing the letter to Pollard.  This argument fails on both counts.  First, we cannot believe that the trial court would have allowed the letter to be redacted when defense counsel would have been the one trying to use the letter as evidence, thereby opening up the contents of the letter to the prosecution.  Second, it also stresses credulity to believe that the prosecution would have failed to notice defense counsel cross-examining Pollard on the contents of the letter, which likewise could have opened up the possibility of the prosecution trying to admit the contents of the whole letter.  We find it eminently reasonable that defense counsel would choose not to use this letter during Pollard's cross-examination and thus will overrule Gibson's objection.

### 6.   Paulinda Moore

Gibson also contends that trial counsel was ineffective for failing to cross-examine Paulinda Moore on her mental illness and that both Judge Wells and the Superior Court erred when finding that the actions of trial counsel did not prejudice Gibson.  Gibson objects to these findings.  We agree with Gibson that prejudice is established by considering claims cumulatively.  But, we also agree with the finding of Judge Wells that Moore was a minor witness whose testimony was corroborated by other witnesses.  We will thus sustain Gibson's objection only in the sense that we will consider trial counsel's ineffective assistance with relation to Moore when we analyze the cumulative effects of all errors as part of our decision on Gibson's final claim.

28

### 7.      Cyril Thomas, Kevin Jones, Kenneth Johnson, and Diane Hess

Finally, Gibson asserts ineffective assistance of counsel claims relating to the testimony of Cyril Thomas, Kevin Jones, Kenneth Johnson, and Diane Hess.  Judge Wells found that Gibson's claims relating to these witnesses were procedurally defaulted since he failed to include them in his PCRA petition.  Gibson objects, noting that the evidence supporting these claims was admitted to the PCRA court, the parties briefed the merits, and the Commonwealth never asserted that the claims were waived when before the PCRA court.  The law does not support Gibson's objection.  The Pennsylvania Supreme Court in Commonwealth v. Kenney, 732 A.2d 1161, 1164 (Pa. 1999), amongst other cases, found that, "[i]n order to preserve claims of ineffectiveness of counsel under the PCRA, the claims must be raised at the earliest stage in the proceedings at which the allegedly ineffective counsel is no longer representing the claimant." Id. (quoting Commonwealth v. Griffin, 644 A.2d 1167, 1170 (1994).  The ineffective assistance of counsel claims were not included in his PCRA petition, and therefore are procedurally defaulted.

### D.      Reasonable Doubt Jury Instruction Claims

Gibson next objects to Judge Wells's finding that the trial court's jury instructions correctly conveyed the concept of reasonable doubt, alleging that the instructions "suggested a higher degree of doubt than is actually required for acquittal."  Obj. at 43.  The Supreme Court has found that jury instructions, "taken as a whole…[must] correctly conve[y] the concept of reasonable doubt to the jury."  Holland v. United States, 348 U.S. 121, 140 (1954).  Moreover, the Supreme Court has approved jury instructions defining reasonable doubt as "a doubt that would cause a reasonable person to hesitate to act."  Victor v. Nebraska, 511 U.S. 1, 20 (1994)

(citing <u>Holland</u>, 348 U.S. at 140).  The Court in <u>Victor</u> further found that jury instructions

describing reasonable doubt as "substantial doubt" were constitutional since the trial court had

explicitly laid out a distinction between "substantial" doubt and "doubt arising from mere

possibility, from bare imagination, or from fanciful conjecture."  511 U.S. at 19-20 (internal

citations and quotations omitted).

> Here, the trial court defined reasonable doubt as:

>> [W]ell-founded in reason and common sense…being one that springs from a fair, thoughtful and careful consideration of the evidence in this case or the lack thereof.  It is not merely a passing fancy…that might come into your minds or a doubt conjured up for the purpose of avoiding an unpleasant duty.  It should be such a doubt as would cause a reasonable person in the conduct of his or her own affairs to stop, hesitate and seriously consider as to whether or not he or she would do a certain thing before finally acting.

N.T. March 13, 1995 at 73.

> We find these instructions almost perfectly analogous to the ones the Court upheld in

<u>Victor</u>.  The trial judge here described reasonable doubt as one that would make a reasonable

person "stop, hesitate and seriously consider" whether the person should be found guilty, and

also gave the jury an explicit instruction as to the distinction between reasonable doubt and "a

passing fancy," -- all but identical to the difference between substantial doubt and fanciful

conjecture approved by the Court in <u>Victor</u>.  We find that the jury instructions comport with the

standards set by the Supreme Court and thus will overrule Gibson's objection on this claim.

**E.     Prosecution's Failure to Correct the Testimony of
        <u>Michael Segal and The Related Ineffective Assistance of Counsel Claim</u>**

Gibson next brings a <u>Napue</u> claim stating that the prosecution violated his constitutional rights when it failed to correct the testimony of Michael Segal.[4]  Both the Superior Court and Judge Wells both found Gibson's <u>Napue</u> and ineffective assistance of counsel claims meritless, with Judge Wells stating "the fact that a prosecution witness' trial testimony varies from his previous statements does not necessarily mean that the prosecution knowingly presented false testimony."  R & R at 70.  Gibson objects to these findings, but we overrule his objections.

As rehearsed, the Supreme Court held in <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959) that the prosecution violated due process when it failed to correct testimony it knew to be false. <u>See also</u> <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972).  Simply put, the prosecution may not knowingly use false evidence, including false testimony, in its case against a criminal defendant. If the petitioner proves that the prosecution knowingly used false evidence when it failed to correct a witness's testimony, a court must then determine whether this error was material.  The standard for this materiality analysis is set out in <u>United States v. Bagley</u>, 473 U.S. 667, 680 (1985), where the Court held that "the fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt."  <u>Id.</u>  Our Court of Appeals has held that, in order to prove a constitutional violation relating to false testimony under <u>Napue</u>, a petitioner must show that: (1) the witness in question committed perjury; (2) the Government knew or should have known the witness committed perjury; (3) the testimony went uncorrected; and (4) there is any reasonable likelihood that the false testimony could have affected the verdict.  <u>Lambert v. Blackwell</u>, 387 F.3d 210, 242 (3d Cir. 2004).  Of particular import to the first prong of this test, our Court of Appeals has noted that, even if the witness's

---

[4] Gibson also brings an ineffective assistance of counsel claim, stating that trial counsel failed to effectively cross examine Michael Segal.

testimony is made in good faith, the Government has an obligation to correct the statement when it should be obvious that the testimony is untrue.  See United States v. Harris, 498 F.2d 1164, 1169 (3d Cir. 1974).

Here, Gibson fails to sustain his claim because he has not shown that Segal committed perjury or that the Commonwealth should have known he might be doing so.  The only evidence to support this claim is that Segal's statements changed over the course of the investigation and trial.  In each subsequent statement after his original one, Segal's description of the attacker came to more closely resemble Gibson.  Obj. at 45 (citing N.T. March 8, 1995 at 91, id. at 78-79).  Moreover, Segal changed his testimony significantly when he first stated that he had not seen a gun and later testified at trial that the attacker was in fact holding a gun.  Compare N.T. November 18, 1994, with N.T. March 8, 1995 at 73.  But, these significant changes alone do not suffice to show that Segal committed perjury or that the Commonwealth should have known he might be doing so.

As our Court of Appeals has held, "[t]here are many reasons testimony may be inconsistent; perjury is only one possible reason."  Lambert, 387 F.3d at 249.  This case is analogous to Lambert.  There, our Court of Appeals held that "[d]iscrepancy is not enough to prove perjury," and that a factual determination by the PCRA Court that the petitioner had failed to prove a witness perjured himself with inconsistent testimony alone was reasonable.  Id.  Here, the PCRA Court similarly found no proof that Segal perjured himself, as the only evidence offered by Gibson is the discrepancy between Segal's statements and his testimony.  Further, because we find no merit in Gibson's Napue claim, and since counsel did cross-examine Segal about his prior inconsistent statements, we similarly reject Gibson's ineffective assistance of

counsel claim as it relates to Segal.  We will overrule Gibson's objections as to both of his claims related to Segal's testimony.

>   **F.   Prosecutorial Misconduct, <u>Brady</u>, and Ineffective
>         <u>Assistance of Counsel Claims Related to Detective Morris's Notes</u>**

Gibson also asserts claims related to Detective Randy Morris's notes, which he relied on when testifying at trial regarding a hypothetical question Gibson asked Detective Stephen Battershell about shooting someone in self-defense.  First, Gibson brings a claim for prosecutorial misconduct, stating that the prosecution improperly elicited this testimony.  Second, Gibson avers that the prosecution's failure to provide defense counsel with Detective Morris's notes constituted a <u>Brady</u> violation.  Third, Gibson argues that counsel was ineffective for failing to obtain Detective Morris's notes from the prosecution.  Judge Wells resolved each claim in favor of the Commonwealth, and Gibson objects.  We will overrule his objections on the prosecutorial misconduct and <u>Brady</u> claims, but will consider his ineffective assistance of counsel claim cumulatively as part of his final claim.

>   **1.   <u>Prosecutorial Misconduct</u>**

We interpret Gibson's prosecutorial misconduct claim related to Detective Morris as a <u>Napue</u> claim and will analyze it accordingly.  The <u>Napue</u> line of cases holds that a prosecutor may not knowingly use false evidence, including false testimony, in its case against a criminal defendant.  360 U.S. at 269.  Here, Gibson has presented no evidence that the prosecutor committed a <u>Napue</u> violation when eliciting this testimony from Detective Morris because he cannot show that Detective Morris perjured himself at trial.  Moreover, Detective Morris's testimony was echoed by Detective Battershell, providing further evidence that it was true.  We will overrule Gibson's objection to the R & R's resolution of this claim.

### 2.    *Brady* Claim

Gibson next asserts a <u>Brady</u> claim in relation to Detective Morris's notes.  The prosecution failed to provide defense counsel with a copy of the notes Detective Morris used when he testified at trial.  The Supreme Court held in <u>Brady</u> that a prosecution's suppression of material evidence favorable to the accused violates due process.  373 U.S. at 87.  It later clarified that <u>Brady</u> applied to both exculpatory evidence and evidence that could be used to impeach witnesses.  <u>See</u> <u>Bagley</u>, 473 U.S. at 676.  The failure to disclose favorable evidence alone is not sufficient to establish a constitutional violation.  <u>See</u> <u>Johnson</u>, 705 F.3d at 128.  A <u>habeas</u> petitioner is only entitled to relief when: "(1) the evidence at issue is favorable to the accused; (2) the evidence was suppressed by the state; and (3) the evidence is material."  <u>Id.</u>

Here, Gibson has not shown that Detective Morris's notes would have helped him at trial, and thus his <u>Brady</u> claims necessarily fail.  The discrepancies between Detective Morris's different descriptions of what exactly constituted his "notes" that he used during trial -- ranging from his own personal notes taken during the questioning of Gibson to a report authored by Detective Battershell -- do not establish that the contents of the notes themselves were favorable.  As Judge Wells accurately noted, the contents of the notes may have corroborated Detective Morris's story, and thus would have been unfavorable to Gibson.  We will overrule Gibson's objection to Judge Wells's finding on this claim.

### 3.    **Ineffective Assistance of Counsel Claim**

Finally, we turn to Gibson's ineffective assistance of counsel claim.  As earlier rehearsed, the right to effective assistance of counsel protects the fundamental right to a fair trial afforded to criminal defendants.  <u>Strickland</u>, 466 U.S. at 685. The Supreme Court has laid out a two-prong

test for determining whether a criminal defendant suffered a violation of his constitutional rights by having ineffective counsel.  First, a <u>habeas</u> petitioner must show that his counsel's performance was deficient, meaning that the representation failed to meet an objective standard of reasonableness as defined by "prevailing professional norms."  <u>Id.</u> at 688.  But, we must be highly deferential to counsel's performance and not "second-guess counsel's assistance after conviction."  <u>Id.</u> at 689.

Second, a petitioner must show prejudice, meaning that he must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u> at 694.  This standard does not require the petitioner to prove that the evidence presented against him would have been insufficient if not for counsel's errors, nor must the petitioner show "that counsel's deficient conduct more likely than not altered the outcome."  <u>Id.</u> at 693.  But it does require the petitioner to go further than simply demonstrating "that the errors had some conceivable effect on the outcome of the proceeding."  <u>Id.</u>; <u>see also</u> <u>Saranchak</u>, 802 F.3d at 588.

We agree with Gibson that it was objectively unreasonable for trial counsel in a capital case to fail to inquire about, and eventually acquire, Detective Morris's notes.  Had the notes contained information corroborating Morris's testimony, counsel would have been free not to use them on cross-examination.  But, if they were helpful, counsel could have used them to more effectively impeach Morris.  The fact that the Superior Court and Judge Wells found that trial counsel did attempt to impeach Morris does not excuse counsel's failure with regard to the notes. We do not find this failure to be prejudicial on its own, as Detective Battershell also testified that Gibson asked a hypothetical question about shooting someone during questioning.  We will, however, include this claim in our cumulative analysis.

### G.    __Cumulative Error__

Finally, Gibson brings a claim for cumulative error, stating that the many errors taken individually may not warrant _habeas_ relief but, when considered together, can be found to have affected the trial in a way that would undermine the verdict.  Judge Wells found Gibson's cumulative error claim to have no merit, and Gibson objects.  While we have disagreed with some of Judge Wells's analysis, we will overrule Gibson's objection because the cumulative effect of the errors Gibson identified did not prejudice him at his trial.

Our Court of Appeals has stated that the cumulative error doctrine "allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his constitutional right to due process." Collins v. Sec'y of Pa. Dep't of Corr., 742 F.3d 528, 542 (3d Cir. 2014).  The Third Circuit has also recognized that "errors that individually do not warrant habeas relief may do so when combined." Albrecht v. Horn, 485 F.3d 103, 139 (3d Cir. 2007) (citing Marshall v. Hendricks, 307 F.3d 36, 94 (3d Cir. 2002)).  Cumulative errors warrant _habeas_ relief "if they had a substantial and injurious effect or influence in determining the jury's verdict." Id. (citing Brecht v. Abrahamson, 507 U.S 619 (1993)).  When performing a cumulative error analysis, a court "aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Id. (quoting Darks v. Mullin, 327 F.3d 1001, 1018 (10th Cir. 2003)).  While we understand that our Court of Appeals has not resolved whether cumulative error claims "constitute clearly established federal law as determined by the Supreme Court for the purposes of deference under AEDPA," Saranchak 802 F.3d at 590, we will perform a _de novo_ analysis of Gibson's claim in an effort to fully resolve his objections.

We have previously found that the following items constitute harmless error that did not prejudice Gibson at his trial: (1) evidence the Edward Jones was a paid informant for the DEA and the Bristol Township Police Department, <u>see</u> PCRA1 Ex. D-69 (Jones Decl.) and PCRAR1 Ex. D-66B; (2) Glenn Pollard's letter to Detective Mullin requesting assistance, N.T. May 29, 2001 at 89; (3) Pollard's letter to the Bucks County District Attorney's Office requesting the same, <u>id.</u>; (4) the court order for Moore to undergo a mental health evaluation, <u>see</u> Order for Mental Evaluation, November 11, 1994; (5) evidence of Eddie Gilbert's involvement in a September 1994 drug sale, <u>see</u> Pet. App'x Vol. III at 628-30; (6) evidence that police damaged the home of Sean Hess's mother while searching for him, <u>see</u> N.T. May 29, 2001 at 164; (7) Hermann Carroll's letter to Detective Gergal offering to testify, <u>see</u> N.T. May 29, 2001 at 125-26; (8) Carroll's letter to Detective Ziemba stating the same, <u>see</u> Mot. to Expand Ex. B25; (9) trial counsel's failure to cross-examine Edward Jones on his status as a DEA informant; (10) trial counsel's failure to cross-examine Paulinda Moore regarding her mental illness; and (11) trail counsel's failure to obtain Detective Morris's notes used to refresh his memory during his trial testimony.

We find that the cumulative effect of the errors did not have a substantial or injurious effect on the jury's verdict. First, nearly all of the evidence tainted by errors was either corroborated in some way or supported by other, untainted evidence. Edward Jones testified that Gibson first told him that he was going to rob a store and then later admitted to committing the crime. Kevin Jones, whose testimony is not affected by the <u>Brady</u> claims, testified to the same thing. Glenn Pollard's testimony that Gibson confessed to the murder while in jail was similarly corroborated by the testimony of Kevin Jones and Kenneth Johnson. Likewise, Paulinda Moore's testimony was substantially matched by Kevin Jones, who testified that he encountered

37

Gibson a short time after Gibson spoke with Moore and that Gibson informed him that Gibson was going to rob and possibly kill a man.  Hermann Carroll testified that Gibson had confessed to the killing, something echoed by Bernard McLean.  Sean Hess testified to both Gibson's motive and eventual confession to the crime.  The confession, as we've stated, was corroborated by Kevin Jones, Kenneth Johnson, and Bernard McLean, among others.  And, while Gibson did not ask anyone else for money to get a new car, as he did with Hess, that day he visited an automobile dealership and tried to purchase a car, as evidenced by Glen Kashdan's testimony.  Finally, Detective Morris's testimony regarding Gibson's hypothetical question posed to police during questioning was matched by the testimony of Detective Battershell, to whom Gibson was actually speaking.  As we stated earlier, the sole exception to this pattern of corroboration was Eddie Gilbert, who testified to receiving the guns involved in the murder from Gibson.  But, Gilbert was cross-examined extensively at trial and his testimony in no way affected the evidence related to Gibson's motive, the eye-witness accounts of the murder and its aftermath, and the numerous confessions made by Gibson.

On this last point, it is clear that the cumulative effect of the errors did not substantially affect the jury's verdict because the case against Gibson was strong.  The prosecution presented evidence establishing motive, illustrating Gibson's plans to rob Ascher Health, placed Gibson at the scene of the crime, and showed that he confessed the murder to numerous associates.  Before the murder, multiple people, including Gibson's aunt, testified to seeing Gibson that day wearing a dark hooded sweatshirt.  Security footage at a bank Gibson visited that same day confirmed he was wearing this apparel.  Michael Segal, a shopkeeper across the street from the building where Berger was killed, saw Berger struggling with an assailant in a dark hooded sweatshirt who matched Gibson's size, build, and complexion.  Alfonso Colon, who lived above the store where

Berger was shot, heard gunshots and saw Gibson leaving the scene while stuffing what appeared to be a handgun into his waistband.  Gibson's cousin, Pamela Harrison, saw Gibson later that day when he visited her home.  She said he was wearing a dark hooded sweatshirt and carrying a handgun.  Finally, Gibson confessed to the murder to Bernard McLean, Kenneth Johnson, and Kevin Jones, among others.  The evidence overwhelmingly supported the conclusion that it was Gibson who killed Berger.

We do not take lightly Gibson's argument that the jury may have seen the evidence presented at trial differently had the prosecution not suppressed evidence favorable to the defense and had defense counsel not committed several unreasonable errors.  It is certainly possible that in a case where evidence tainted by errors is not corroborated by other evidence, and where the prosecution's case is not so overwhelming that these errors would constitute a constitutional violation, would warrant a grant of habeas relief.  But that hypothetical case is not before us here.  Instead, much of the testimony Gibson claims to be tainted by constitutional violations is corroborated by untainted evidence, and the overall case the Commonwealth presented was quite strong.  Gibson's cumulative error claim fails even on de novo review and we will overrule his objection to the R & R.

### H.    Request for Discovery

Gibson also objects to Judge Wells's decision denying his supplemental motion for discovery.  See docket entries nos. 69 and 72.  We do not find that Judge Wells abused her discretion when denying this motion.  A habeas petitioner needs to show good cause for requested discovery.  See Rules Governing Section 2254 Cases in the United States District Courts 6(a).  A petitioner shows good cause when "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to

demonstrate that he is…entitled to relief." Bracy v. Gramley, 520 U.S. 899, 908-09 (1997) (internal citations and quotations omitted).

Gibson's objection fails for two reasons.  First, the facts are fully developed.  This case has been ongoing in the state and federal court systems for twenty years.  Judge Wells allowed for extensive discovery in this matter, and this discovery yielded information that was the basis for many of the claims discussed in this petition.  Additional discovery into case files within three separate government entities in the nineteenth year of proceedings is the very definition of a fishing expedition.  Second, even if the facts were not fully developed, there is no reason to believe that Gibson would have been able to demonstrate that he was entitled to relief had he obtained those files.  As we have demonstrated with our analysis of the errors committed at Gibson's trial, even if discovery had yielded evidence that would have further impeached the witnesses listed in Gibson's objections, the remaining evidence overwhelmingly supported a guilty verdict.  We will thus deny Gibson's objection to Judge Wells's denial of his supplemental motion for discovery.

I.      **Request for Hearing**

Gibson next requests an evidentiary hearing to more fully develop the facts in this case. As we previously stated, we find that it risks understatement to note the facts in this case are fully developed.  Moreover, the record does not support Gibson's assertion that he was denied a full and fair hearing in the state courts. We will deny Gibson's request for an evidentiary hearing.

J.      **Certificate of Appealability**

Finally, Gibson requests that we issue a certificate of appealability even if we approve and adopt the R & R.  We decline to do so.  A petitioner who seeks to appeal a final order of a

district court must obtain a certificate of appealability for each claim he wishes to present to the Court of Appeals, see 28 U.S.C. § 2253 and Fed. R. App. P. 22(b), and the petitioner must make "a substantial showing of the denial of a constitutional right" to obtain a COA. 28 U.S.C. § 2253(c)(2). The Supreme Court has held that a certificate of appealability should be granted only when jurists of reason could debate procedural or substantive dispositions of a petitioner's claims. Slack v. McDaniel, 529 U.S. 473, 484 (2000). It further summarized this standard in Miller-El v. Cockrell, 537 U.S. 322, 336 (2003), stating that a petitioner must show that "reasonable jurists could debate whether…the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." (quoting Barefoot v. Estelle, 463 U.S. 880 (1983)) (internal citations omitted). A petitioner need not, however, demonstrate that the appeal will succeed. Id.

We find that reasonable jurists could not debate whether this petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. This is highlighted by the fact that, when performing our cumulative Brady and error analyses, we did so de novo without giving any deference to the decisions made by the state courts. Of course, AEDPA mandates that we uphold the state court's resolution of any claims so long as the resolution is reasonable. Since we came to the same conclusion as the state court without any hesitation, it is obvious that its disposition of the case was reasonable. Reasonable jurists could not disagree with our resolution of this matter, and we will therefore decline to issue a certificate of appealability.

**V.     Conclusion**

We find that Gibson's objections to the substantive findings of Judge Wells's R & R lack merit. Moreover, Judge Wells did not abuse her discretion when denying Gibson's motion for

supplemental discovery.  We will therefore approve and adopt Judge Wells's R & R, dismiss Gibson's petition with prejudice and without holding an evidentiary hearing, and decline to issue a certificate of appealability.

BY THE COURT:

 /s/ Stewart Dalzell, J.
Stewart Dalzell, J.